Gregory M. Fox, State Bar No. 070876
Joanne Tran, State Bar No. 294402
BERTRAND, FOX, ELLIOT, OSMAN & WENZEL
The Waterfront Building
2749 Hyde Street
San Francisco, California 94109
Telephone:     (415) 353-0999
Facsimile:     (415) 353-0990
E-mail: gfox@bfesf.com
         jtran@bfesf.com

Attorneys for Defendants
COUNTY OF LAKE, BRIAN MARTIN, GREG HOSMAN,
RENEE LEFFLER, JAMES RHINE, DOUGLAS ALEMAN,
JARED MCCOLOUGH, JOSHUA PHILLIPI, KALEN
BROCKWALDER and MICHAEL DAVIS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

DANE SHIKMAN,

     Plaintiff,

v.

COUNTY OF LAKE; COUNTY OF LAKE
SHERIFF BRIAN MARTIN; CAPTAIN
GREG HOSMAN; SERGEANT RENEE
LEFFLER; OFFICER JAMES RHINE;
OFFICER DOUGLAS ALEMAN; OFFICER
KATHERINE PRINCE; OFFICER JARED
MCCOLOUGH; OFFICER JOSHUA
PHILLIPI; DEPUTY KALEN BROCK
WALDER; DEPUTY MICHAEL DA VIS;
CALIFORNIA FORENSIC MEDICAL
GROUP; TAYLOR FITHIAN, M.D.;
ROBBIN BRIGGS; MONIQUE QUILLEN;
MANDY ROBBINS; ALISHA
STOTTSBERRY; and DOES 1-50,

     Defendants.

Case No. 1:16-cv-05121-RMI

**DEFENDANTS COUNTY OF LAKE, BRIAN MARTIN, GREG HOSMAN, RENEE LEFFLER, JAMES RHINE, DOUGLAS ALEMAN, JARED MCCOLOUGH, JOSHUA PHILLIPI, KALEN BROCKWALDER AND MICHAEL DAVIS' (LAKE COUNTY DEFENDANTS) MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**
[FRCP RULE 56]

Date:    April 20, 2018
Time:    10:00 a.m.
Place:   Eureka Courthouse
         3140 Boeing Avenue
         McKinleyville, California 95519

**Hon. Robert M. Illman**

## <u>TABLE OF CONTENTS</u>

I.  SUMMARY OF ARGUMENT AND STATEMENT OF ISSUES TO BE DECIDED .................1

II.  STATEMENT OF FACTS ...........................................................................................1

III.  LEGAL ARGUMENT ................................................................................................9

    A.  Summary Judgment is Proper in this Case ........................................................9

    B.  The Undisputed Evidence Establishes that Plaintiff's §1983 Claim for Deliberate Indifference to Serious Medical Needs Is Unsupportable ....................................9

        1.  Plaintiff's 14th Amendment Claim Against the Deputies and Officers Is Unsupported by Evidence ....................................................................10

        2.  The Undisputed Evidence Fails to Support a Supervisory Liability Claim...........17

        3.  Plaintiff's §1983 Claim Against the County, Martin and Hosman Is Unnecessarily Duplicative and Meritless................................................17

    C.  The Officers are Entitled to Qualified Immunity from Plaintiff's §1983 Claims.............18

    D.  The *Monell* Claim for Inadequate Policies, Customs or Practices Is Meritless................20

    E.  The *Monell* Claim for Inadequate Training Is Unsupported by Evidence ........................22

    F.  The Undisputed Evidence Fails to Support a Negligence Claim.......................................24

    G.  Plaintiff Lacks Evidence to Show a Violation of Gov. Code §845.6 ...............................24

    H.  Plaintiff Has No Evidence to Establish a Claim for Violation of the ADA .....................25

    I.  Plaintiff Has No Evidence to Establish a Claim for Violation of Civil Code §51 for Discrimination and Failure to Accommodate Gaunt's Alleged Mental Disability...........25

IV.  CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*AE ex rel. Hernandez v. County of Tulare,*
    666 F.3d 631 (9th Cir. 2012) ................................................21, 22

*Aguilera v. Baca,*
    510 F.3d 1161 (9th Cir. 2007) .......................................................21

*Arres v. City of Fresno,*
    2011 WL 284971 (ED Cal. 2011)..................................................18

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) ......................................................................19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).........................................................................9

*Atayde v. Napa State Hosp.,*
    2016 WL 4943959 (E.D. Cal. 2016)..............................................12

*Bd. of the Cnty. Comm'rs. of Bryan Cnty. v. Brown,*
    520 U.S. 397 (1996)................................................................21, 22

*Blankenhorn v. City of Orange,*
    485 F.3d 463 (9th Cir. 2007) .........................................................10

*Bremer v. Cnty. of Contra Costa,*
    2016 WL. 6822011 (N.D. Cal. 2016) ...............................13, 15, 16

*Brosseau v. Haugen,*
    543 U.S. 194 (2004).......................................................18, 19, 20

*Butler v. Elle,*
    281 F.3d 1014 (9th Cir. 2002) .......................................................18

*Castro v. Cnty of Los Angeles,*
    833 F.3d 1060 (9th Cir. 2016) .......................10, 11, 12, 16, 21

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1996).........................................................................9

*Center for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff,*
    533 F.3d 780 (9th Cir. 2008) .........................................................18

*City of Canton v. Harris,*
    489 U.S. 378 (1989)........................................................21, 22, 23

*City of Los Angeles v. Heller,*
    475 U.S. 796 (1986).......................................................................21

*City of St. Louis v. Praprotnik,*
    485 U.S. 112 (1988).......................................................................21

*Clement v. Gomez,*
    298 F.3d 898 (9th Cir. 2002) ...................................................................................11

*Clouthier v. Cnty. of Contra Costa,*
    591 F.3d 1232 (9th Cir. 2010) .....................................................................10, 14, 15

*Conn v. City of Reno,*
    591 F.3d 1081 (9th Cir. 2010) ..........................................................................11, 14

*Connick v. Thompson,*
    563 U.S. 51 (2011)............................................................................................21, 23

*Daniels v. Williams,*
    474 U.S. 327 (1986).................................................................................................9

*Darling v. Los Angeles Cnty. Sheriff's Dep't,*
    695 F.App' 216 (9th Cir. 2017) ..............................................................................13

*Devereaux v. Abbey,*
    263 F.3d 1070 (9th Cir. 2001) ..................................................................................9

*Dougherty v. City of Covina,*
    654 F.3d 892 (9th Cir. 2011) ..................................................................................23

*Edwards v. Mondora,*
    700 F.App'x 661 (9th Cir . 2017) ............................................................................13

*Estate of Sandra Vela v. Cnty. of Monterey,*
    2016 WL 4678300 (N.D. Cal. 2016) .......................................................................12

*Farmer v. Brennan,*
    511 U.S. 825 (1994)..........................................................................................11, 13

*Gibson v. Cty. Of Washoe,*
    290 F.3d 1175 (9th Cir. 2002) ..........................................................................10, 11

*Guerra v. Sweeny,*
    2016 WL 5404407 (E.D. Cal. 2016).............................................................11, 12, 13

*Guzman v. Cnty. of Monterey,*
    46 Cal.4th 887 (2009) .............................................................................................24

*Homes v. Summer,*
    188 Cal.App.4th 1510 (2010) ..................................................................................24

*Hunter v. Bryant,*
    502 U.S. 224 (1991).................................................................................................18

*J.L. v. Children's Institute, Inc.,*
    177 Cal.App.4th 388 (2009) ....................................................................................24

*James v. Lee,*
    2016 WL 5338074 (E.D. Cal. 2016).........................................................................12

*Jeffers v. Gomez,*
    267 F.3d 895 (9th Cir. 2001) ............................................................................11, 17

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

*Jett v. Penner*,
439 F.3d 1091 (9th Cir. 2006) ...................................................................... 10, 24

*Johnson v. City of Vallejo*,
99 F.Supp.3d 1212 (E.D. Cal. 2015) .................................................................... 17

*Jones v. Williams*,
297 F.3d 930 (9th Cir. 2002) .............................................................................. 10

*Kentucky v. Graham*,
473 U.S. 159 (1985) ........................................................................................... 18

*Kingsley v. Hendrickson*,
135 S.Ct. 2466 (2015) ................................................................................. 11, 18

*Leer v. Murphy*,
844 F.2d 628 (9th Cir. 1988) ............................................................................... 9

*Lolli v. Cnty. of Orange*,
351 F.3d 410 (9th Cir. 2003) ........................................................................ 10, 11

*Lopez v. City of Los Angeles*,
196 Cal.App.4th 675 (2011) ............................................................................... 24

*Lucas v. City of Long Beach*,
60 Cal.App.3d 341 (1978) ............................................................................ 24, 25

*Luke v. Abbot*,
954 F.Supp. 202 (C.D. Cal. 1997) ..................................................................... 18

*Maag v. Wessler*,
960 F.2d 773 (9th Cir. 1991) ............................................................................. 19

*Mattos v. Agarano*,
661 F.3d 433 (9th Cir. 2011) ....................................................................... 19, 20

*Monell v. New York Dept. of Social Servs.*,
436 U.S. 658 (1978) ........................................................................ 18, 20, 21, 23

*Monteilh v. County of Los Angeles*,
820 F.Supp.2d 1081 (C.D. Cal. 2011) ............................................................... 10

*Nyland v. Calaveras Cnty. Sheriff's Jail*,
688 F.app.x 483 (9th Cir. 2017) ........................................................................ 13

*O'Guinn v. Lovelock Corr. Ctr.*,
502 F.3d 1056 (9th Cir. 2007) ........................................................................... 25

*Parratt v. Taylor*,
451 U.S. 527 (1981) ............................................................................................. 9

*Parsons v. Crown Disposal Co.*,
15 Cal.4th 456 (1997) ........................................................................................ 24

*Pearson v. Callahan*,
129 S.Ct. 808 (2009) ............................................................................... 9, 18, 19

iv

*Pembaur v. City of Cincinnati*,
   475 U.S. 469 (1986) .......................................................................................21

*Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*,
   130 F.3d 432 (9th Cir. 1997) ........................................................................21

*Plumhoff v. Rickard*,
   134 S.Ct. 2012 (2014) ...................................................................................20

*Preschooler II v. Clark County Sch. Bd. Of Trs.*,
   479 F.3d 1175 (9th Cir. 2007) ......................................................................17

*Reichle v. Howards*,
   132 S.Ct. 2088 (2012) ...................................................................................19

*Rickets v. Holland*,
   2016 WL 6155926 (C.D. Cal. 2016) .............................................................12

*Sandoval v. Cnty. of San Diego*,
   2018 WL 733775 (S.D. Cal. 2018) ..........................................................12, 13

*Saucier v. Katz*,
   533 U.S. 194 (2001) ......................................................................................19

*Simmons v. Navajo Cnty, Ariz.*,
   609 F.3d 1011 (9th Cir. 2010) ...........................................................10, 14, 15

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ......................................................................17

*Taylor v. List*,
   880 F.2d 1040 (9th Cir. 1989) ......................................................................17

*Toguchi v. Chung*,
   391 F.3d 1051 (9th Cir. 2004) ......................................................................11

*Watkins v. City of Oakland*,
   145 F.3d 1087 (9th Cir. 1998) ......................................................................17

*Watson v. State*,
   21 Cal.App.4th 836 (1993) ...........................................................................24

*White v. Pauly*,
   137 S.Ct. 548 (2017) .........................................................................18, 19, 20

*White v. Roper*,
   901 F.2d 1501 (9th Cir. 1990) ........................................................................9

*Wilhelm v. Rotman*,
   680 F.3d 1113 (9th Cir. 2012) ......................................................................10

*Williams v. Ralston*,
   2014 WL 3926990 (C.D. Cal. Aug. 12, 2014) ..............................................10

*Wishaar v. Cnty. of Napa*,
   2016 WL 7242122 (N.D. Cal. 2016) .............................................................13

**Statutes**

Government Code Section 815(a)........................................................................................24

Government Code Section 820.8...........................................................................................24

Government Code Section 845.6...........................................................................................24

**Rules**

Federal Rules of Civil Procedure, Rule 56(e)........................................................................9

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

**NOTICE**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on April 20, 2018, at 10:00 a.m. at the Eureka Courthouse of the Federal District Court, located at 3140 Boeing Avenue, McKinleyville, California, the Lake County Defendants will and hereby do move this Court Pursuant to FRCP Rule 56 for summary judgment, or partial summary judgment.  Summary judgment is warranted because the uncontroverted evidence establishes that: defendants were not deliberately indifferent to Gaunt's medical/mental health needs, defendants are entitled to qualified immunity, the municipal liability claims are unsupportable and the ADA and state law claims are meritless.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     SUMMARY OF ARGUMENT AND STATEMENT OF ISSUES TO BE DECIDED**

Plaintiff Dane Shikman has no evidence to support his §1983 claims for deprivation of medical/mental health care, or any of his state law claims against the Lake County Defendants (irrespective of claims against defendant Prince, who is represented by separate counsel and not included in the instant motion) arising out of decedent Elizabeth Gaunt's jail suicide on August 2, 2015.

**II.     STATEMENT OF FACTS**

On August 1, 2015, Deputy Brockwalder and Sgt. Davis responded to reports of a suspicious person.  (Brockwalder Depo. 22:17-23:12; Davis Depo. 26:2-27:13, 31:1-6, 39:2-16.)  They contacted "Carrey Scott" (later identified as decedent Gaunt) (Brockwalder Depo. 23:20-24:10; Davis Depo. 32:22-34:4.)  Gaunt had tremors in her eyelids indicating stimulant use, she was tense and rigid, making jerking movements, spoke rapidly, was incredibly thirsty, made incoherent statements, and was missing all of her molars, which Brockwalder knew was common in people who smoke methamphetamine or crack. Brockwalder believed she was under the influence of a controlled substance.  (Brockwalder Depo. 24:11-25:6, 29:17-30:8.)  She said she came on a Greyhound bus from Maine, thought she was in Florida, believed it was 2005, and president was George Bush; which reinforced Brockwalder's belief she was under the influence of a controlled substance.  (Brockwalder Depo. 25:18-26:20; Davis Depo. 45:2-14.) He believed the name "Carrey Scott" was false.  (Brockwalder Depo. 28:24-29:16; Davis Depo. 69:16-70:3.)  In response to questioning, Gaunt said she did not take medication or have any illness, said she

1

1   was not suicidal, and did not feel like hurting herself.  (Brockwalder Depo.31:23-32:18, 34:20-35;6;

2   Davis Depo. 52:7-25.)  Based on Gaunt's responses and her physical condition, Brockwalder believed

3   Gaunt was a long-term drug user.  (Brockwalder Depo. 32:19-33:12.)  Field sobriety tests ("FST")

4   showed Gaunt's pulse was elevated and her estimates of time were incorrect, consistent with the

5   determination that she was under the influence.  (Brockwalder Depo. 39:5-40:23; Davis Depo. 34:5-35:4;

6   70:4-17, 83:11-21.)  It was unsafe and unlawful for Gaunt to be under the influence in public, and she

7   was arrested and transported to the Lake County jail.  (Brockwalder Depo. 33:13-34:6, 44:18-46:4, 60:1-

8   19; Depo.; Davis Depo. 70:18-71:6.)  The deputies' contact with Gaunt extended nearly one hour, and

9   nothing in their contacts or observations of her indicated that she was suicidal rather than being under the

10  influence.  (Davis Depo. 52:7-54:1.)

11       Brockwalder completed pre-booking intake questions at the jail, again asking Gaunt whether she

12  wanted to hurt herself or had any suicidal thoughts. Gaunt said "no" and this was documented on the

13  intake form. She refused a chemical test or to sign the refusal form.  (Brockwalder Depo. 35:7-36:21,

14  41:6-14; Davis Depo. 74:5-75:12, 75:16-76:3; Leffler Depo. 102:1-103:5.)  Brockwalder spoke with

15  Officer Rhine who was assigned to the jail booking area, and advised that Gaunt reported she did not feel

16  suicidal.  (Brockwalder Depo. 43:18-44:6; Rhine Depo. 19:25-20:3, 20:19-22:15, 25:18-26:8, 27:14-

17  28:1.)  The deputies believed Gaunt would remain at the jail until she was sober then be cited and

18  released, the usual practice for people arrested for public intoxication in Lake County.  (Brockwalder

19  Depo. 51:9-52:2; Davis Depo. 71:7-15; Rhine Depo. 120:20-121:25, 122:6-20, 123:14-25.)

20       Sgt. Leffler conducted a pat down of Gaunt, and Rhine completed Gaunt's pre-booking medical

21  questionnaire.  (Rhine Depo. 19:25-20:3, 20:19-22:15, 36:15-25, 38:8-11; Leffler Depo. 30:15-31:1.)

22  Gaunt gave Rhine a false name, exhibited very obvious signs and symptoms of being under the influence

23  and appeared intoxicated.  She was cooperative, but confused, unable to keep focused, slurred speech and

24  was paranoid that the government was following her.  (Rhine Depo. 20:19-22:15, 29:1-4, 29:21-30:1,

25  30:14-31:6, 31:19-32:19, 34:11-35:6, 73:20-21, 74:6-7, 144:5-22.)  She was unsteady, had high energy,

26  her focus quickly shifted to different stimuli with a track mark and scar tissue on her arm indicating

27  intravenous drug use.  (Rhine Depo. 35:7-21, 53:4-23, 74:8-75:9.)  Rhine determined she should be

28  placed in a sobering cell and requested a medical clearance which was routinely done before placement

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

in the sobering cell to ensure she met the criteria for said placement.  (Rhine Depo. 20:19-22:15, 38:12-14, 39:11-23, 49:13-50:3; Leffler Depo. 96:14-97:7; Briggs Depo. 30:1-22, 32:8-12, 86:5-11.)

The intake medical exam at 1:27 p.m. was by Nurse Briggs from CFMG, the entity contracted to provide medical services at the jail.  Medical staff determine if medical or mental health evaluation was needed, given their training and expertise in that area.  (Rhine Depo. 127:1-128:22.)  Briggs saw Gaunt appeared heavily intoxicated under the influence of methamphetamine.  Briggs disbelieved Gaunt's statement that she only took prescription medications, but could not get any other information from her because her responses were unintelligible.  Briggs had no information as to whether Gaunt had any mental health condition and felt such information was irrelevant because she was intoxicated and needed to sober up first.  Briggs knew withdrawal was lengthy and she decided Gaunt should be placed in a sobering cell without the medical intake being completed until she sobered up.  (Briggs Depo. 14:18-18:21, 19:12-23, 20:17-22:18, 23:4-20, 26:4-24, 28:12-14, 29:18-30:9; 31:12-32:2, 33:23-35:2, 36:8-19, 38:23-39:4, 39:5-15, 40:1-3, 41:3-5, 55:5-23, 57:15-59:1, 81:18-82:9, 86:12-87:4, 88:24-89:24, 90:12-92:11, 93:20-94:8, 97:5-11, 101:1-20, 103:20-23, 107:13-23, 110:6-24, 113:16-24, 114:10-18, 115:23-116:21, 117:5-118:4, 129:13-130:13, 135:17-136:16, 151:23-152:14.)  Medical staff never said Gaunt should be taken for a medical or mental health evaluation.  (Rhine Depo. 118:22-119:6, 119:17-20, 124:1-19, 138:8-13; Briggs Depo. 8:1-3.)

After Gaunt was in the sobering cell she told Rhine that she had been using methamphetamine.  (Rhine Depo. 52:13-23; Leffler Depo 57:23-58:4.)  The sobering cell has a large window, and a short four-feet high wall to provide toilet privacy, but deputies could see someone's head if on the toilet.  (Rhine Depo. 79:13-81:14.)  Safety checks per policy occurred every 15 minutes and were recorded on the Sobering Cell Observation Log.  (Rhine Depo. 76:13-77:8; Prince Depo. 96:4-11, 115:1-116:13; Leffler Depo. 32:22-33:8, 97:8-25.)  To check the cell officers visually observed detainees to ensure movement and breathing, cameras and monitors supplemented visual observations but were not a replacement.  Deputies would enter the cell if an inmate did not appear safe.  (Rhine Depo. 81:15-83:1 Prince Depo. 99:3-100:7, 106:9-107:7, 107:24-109:15, 110:8-23; Philippi Depo.74:4-75:21, 79:9-80:12.)  Rhine checked on Gaunt at about 15-minute intervals, and at the different check points found her washing her face, scrubbing her cell with socks on her hands, pacing, moving, fidgeting and verbally

1  responsive.  (Rhine Depo. 78:7-24, 84:23.)  He last checked Gaunt at 4:40 p.m. before his shift ended at 6

2  p.m. and found her cooperative and verbally responsive.  (Rhine Depo. 85:2-23, 107:7-17.)  He never

3  heard her yelling, calling for help or banging on the cell door at any time.  (Rhine Depo. 119:21-120:19.)

4  Gaunt's condition remained the same and did not improve during Rhine's shift, which was not

5  uncommon for someone experiencing meth psychosis.  (Rhine Depo.96:1-97:5, 98:3-99:3, 99:13-100:7.)

6       Jail personnel relied on medical staff to determine whether medical treatment was needed for

7  people in the sobering cell.  (Rhine Depo. 100:17-102:16.)  The *safety cell* was not used as a holding cell,

8  inmates only were transferred from a sobering cell to the safety cell if they were physically hurting

9  themselves or expressed suicidal ideation or behavior.  (Rhine Depo. 128:23-130:5; Robbins Depo.

10  49:24-50:1.)  If Briggs believed medical care, more frequent checks or transfer to another location was

11  needed, she was charged with making those determinations and to recommend alternatives.  (Briggs

12  Depo. 40:21-25, 61:6-17, 72:5-15, 74:14-19, 77:2-10, 118:5-10, 120:4-18.)  Gaunt's activity increased

13  after another inmate was placed with her and Briggs concluded Gaunt was still "going up" from the

14  stimulant affecting her.  (Briggs Depo. 108:6-109:4.)  Briggs examined Gaunt at 6:50 p.m. and found her

15  vitals were still elevated and she was unable to provide coherent information.  (Briggs Depo. 56:2-17,

16  60:12-61:5, 111:17-113:6.)  Gaunt said she took Adderall and an opiate, and said she was in the Sonoma

17  County jail at some point, but Briggs had incomplete information.  (Briggs Depo. 22:19-23:3, 56:18-21,

18  57:2-7, 96:1-14, 109:5-19.)  Gaunt remained in the sobering cell.  (Briggs Depo. 109:20-22.)

19       Deputy Philippi worked the next shift from 6:00 p.m. to 6:00 a.m.  (Philippi Depo. 12:16-23,

20  16:8-14, 18:7-9.)  (See Philippi Depo. 17:11-18:6.)  Phillipi saw Gaunt at 7:40 p.m., and then every 15

21  minutes until 12:27 a.m. on August 2.  Gaunt was alternately walking, sitting, laying down, counting her

22  fingers, and still displaying signs of being under the influence.  (Philippi Depo. 40:23-47:12.)

23       At 7:00 p.m. Nurse Quillen took over supervising Gaunt's medical care and knew that Gaunt was

24  in the sobering cell because she was "under the influence."  (Briggs Depo. 122:6-8; Quillen Depo. 8:5-

25  15, 27:17-28:4.)  Quillen examined Gaunt inside the sobering cell at 10:18 p.m. on August 1 and found

26  she was awake, cooperative, and in no apparent distress.  (Quillen Depo. 17:24-18:7, 20:9-13, 22:3-24,

27  23:12-24:8, 24:20-26:1, 29:13-30:6, 30:15-31:4.)  Quillen checked Gaunt every four hours and all times

28  she did not appear to be in distress.  (Quillen Depo. 23:2-11, 26:9-17, 28:15-29:12; 30:7-10, 31:5-23,

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

1   32:6-33:4, 35:3-16, 82:12-83:11, 84:9-17.)  Quillen never assessed Gaunt for suicide risks because Gaunt

2   was not suicidal.  (Quillen Depo. 40:12-22, 42:10-43:6.)  Quillen never observed any torn blankets in

3   Gaunt's cell.  (Quillen Depo. 46:6-8.)

4   At about 10:24 p.m., Philippi conducted a FST on Gaunt to see if she was still under the influence

5   of a controlled substance, and typically communicated the FST information to medical staff.  (Philippi

6   Depo. 20:8-22:25, 23:23-24:11, 26:13-16, 31:17-23, 38:4-15.)  Gaunt appeared to be in good spirits and

7   was pleasant and cooperative; and did not appear confused.  (Philippi Depo. 27:1-2, 27:20-28:16, 32:9-

8   33:3.)  Gaunt said she took prescribed Ativan and Tramadol, but admitted she substituted

9   methamphetamine when she could not get her prescriptions refilled, and Philippi knew these medications

10  used together could produce symptoms of meth intoxication.  (Philippi Depo. 29:14-31:6.)  Rhine did not

11  conduct other FSTs because Gaunt's behavior in the sobering cell remained the same, indicating her

12  condition had not improved to pass a FST.  (Philippi Depo. 34:23-36:4, 55:8-56:16.)  Philippi observed

13  Gaunt at 1:28 a.m., 1:58 a.m., 2:25 a.m., 3:13 a.m., 4:30 a.m. and 5:15 a.m. before his shift ended at 6:00

14  a.m., and observed she was variously laying down and moving, attempting to interact with unknown

15  things, and standing at the window.  (Philippi Depo. 47:5-50:16, 96:11-97:2.)  Philippi never heard Gaunt

16  yelling for a medical doctor, and she showed gradual improvement, but not sufficient for clearance from

17  the sobering cell.  Philippi observed nothing that Gaunt was suicidal.  (Philippi Depo. 62:9-12, 94:22-

18  96:10, 97:8-12.)  He observed that she had a sobering cell blanket, which was made from an old general

19  population blanket torn in half.  The blanket appeared to be intact and he would have removed it if it had

20  been torn.  (Philippi Depo. 82:16-83:17, 84:4-85:21.)

21  Officer McCollough came on duty on August 2 at 6:00 a.m. with Sgt. Leffler and Officer Prince,

22  and Philippi related that Gaunt was under the influence.  (McCollough Depo. 26:5-13, 27:12-22; Prince

23  Depo. 56:19-57:8, 59:17-24; 61:17-62:9, 80:9-24; Leffler Depo. 39:12-14.)  At 6:00 a.m., McCollough

24  asked Gaunt if she was okay, and she said she was.  (McCollough Depo. 39:21-40:6, 40:23-42:14.)

25  McCollough did a cell check at 6:14 a.m. and she was talking; he then returned at 6:30 a.m. with Prince

26  to deliver breakfast; and checked her again at 6:44 a.m. when she was eating.  (McCollough Depo. 42:15-

27  44:25; Prince Depo. 129:2-15.)  McCollough continued to check her in the sobering cell every 15

28  minutes from 6:44 to 7:30 a.m., and 8:45 to 9:40 a.m., during which time he observed she was in front of

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

1  the privacy wall talking, verbal, responsive and breathing.  (McCollough Depo. 47:2-49:16.)

2       Nurse Robbins took over the medical staff duties after Quillen, and Quillen communicated that

3  Gaunt was stable and other relevant information.  (Robbins Depo. 14:24-15:5, 17:13-25, 18:14-20,

4  154:2-14; Prince Depo. 64:5-10.)  Gaunt could not be released until she passed a FST and was sober

5  enough to be released.  (Robbins Depo. 22:10-23:1.)  Robbins, accompanied by Prince, observed Gaunt

6  for less than five minutes from outside the cell at about 10:10 a.m. and found she still would not provide

7  clear answers, and her medical history was incomplete.  (Robbins Depo. 23:21-25, 25:13-26:11, 107:23-

8  108:5; Prince Depo. 135:4-12.)  Robbins believed Gaunt was intoxicated, and she observed that Gaunt

9  was pacing, fidgety, and had a large bruise, scab marks and pin size holes on both arms and stomach,

10  which Gaunt said were caused by black ants, and she rambled about mites and spiders under her skin.

11  (Robbins Depo. 28:4-29:1, 33:14-35:4; Prince Depo. 133:19-134:16.)  Gaunt was cooperative but did not

12  clearly answer questions, and it appeared she was under the influence or possibly a mental health issue,

13  and her mental condition appeared to have deteriorated.  (Robbins Depo. 29:18-32:25, 35:17-36:7, 114:2-

14  115:18, 134:1-24.)  Six hours and 40 minutes had elapsed between Quillen's last check and Robbins's

15  check.  (Robbins Depo. 37:22-38:22, 49:7-14.)

16       McCollough again checked Gaunt in the sobering cell every 15 minutes from 10:36 a.m. to 12:38

17  p.m., including bringing her lunch at 11:38 a.m.  He observed Gaunt was verbal, breathing, talking,

18  dancing, laughing and interacting with her cellmate at approximately 11:53 a.m., but her behavior and

19  demeanor declined once her cellmate was removed and she was yelling and screaming at 12:08 p.m.

20  (McCollough Depo. 49:22-52:3, 53:3-55:17, 55:18-20, 63:17-64:5.)  At 12:38 p.m., McCollough opened

21  the door to Gaunt's cell and conducted his last observation of her in her cell before he left the booking

22  area for a different part of the jail.  He did not perform a FST on Gaunt because it appeared she was

23  unable to complete the tests.  Because of her condition, she was not cited and released and remained in

24  the sobering cell.  (McCollough Depo. 52:4-53:2; 65:9-22, 74:7:25, 80:2-18.)  Prince also checked on

25  Gaunt at 11:05 a.m. and 11:56 a.m. when her cellmate was still with her, and Gaunt was rambling and

26  talking about plans they had to move in with her cellmate.  (Prince Depo. 139:20-140:9, 141:25-142:18.)

27       Leffler checked on Gaunt at 1:10 p.m. and does not recall seeing torn blankets in the cell, and she

28  would have taken them away if she had seen that.  (Leffler Depo. 61:16-63:15, 64:21-65:22.)  At about

6

1:40 p.m. Leffler checked on Gaunt in the sobering cell, spoke to her at the window and got toilet paper for her. (Leffler Depo. 65:23-67:2.) Leffler again interacted with Gaunt at 1:47 p.m. and Gaunt said she needed medical. (Lefffler Depo. 71:18-72:20, 74:3-11.) Leffler contacted the jail nurse on her radio for a medical response, and Robbins responded within minutes at 1:50 p.m. (Leffler Depo. 75:8-76:24, 77:21-78:2, 78:25-79:2, 112:15-113:14, 117:22-118:10.) Gaunt never indicated that she was going to injure or kill herself in the two days Leffler interacted with her in jail, and Leffler did not believe she was suicidal. (Leffler Depo. 104:23-105:7, 105:16-25, 113:24-114:21.) Leffler was scheduled to leave at 2:00 p.m. that day, and she left the jail at about 1:48 p.m. (Prince Depo. 60:21-61:8, 91:24-92:11, 150:13-24; McCollough Depo. 35:9-15; Leffler Depo. 27:14-20, 80:18-81:22, 86:11-14.)

At about 1:50 p.m. Robbins returned to check Gaunt, who no longer had a cellmate. Prince said it was unsafe for Robbins to enter the cell with Gaunt, so she evaluated her from the window. (Robbins Depo. 44:10-13, 46:20-47:12, 61:12-62:5, 115:19-116:11, 162:2-5.) At about 2:00 p.m., Gaunt was yelling, pacing and hitting the glass and told Robbins she needed a medical doctor. Robbins felt it was unsafe to enter the cell and she spoke to her at the window. Gaunt repeatedly talked about bites and ants on her arms. She was uncooperative and behaving in a manner that was so unsafe Robbins did not enter the cell with her, and she was unable to get Gaunt's vital signs. Robbins did not call a medical doctor for her. (Robbins Depo. 39:5-20, 41:11-22, 42:20-43:6, 44:5-45:24, 47:13-48:13, 52:13-25; 62:6-63:2, 111:5-25, 130:13-132:8, 162:6-8.) Based on her interaction with Gaunt at 10:10 a.m. and 2:00 p.m., Robbins believed Gaunt had some sort of mental health issue and was still high on something, but she did not know the cause of either because Gaunt was uncooperative providing information. (Robbins Depo. 57:7-59:7, 138:12-140:4, 142:5-8.) Robbins went back to the cell window at 2:07 p.m. and saw Gaunt's gait was steady, she was calm and cooperative, no longer waving her arms. Robbins said Gaunt could come out of the sobering cell. Gaunt provided Robbins with phone numbers for her ex-husband and son. (Robbins Depo. 20:9-22:9, 63:3-64:13, 66:1-12, 162:9-13; Prince Depo. 81:7-18, 82:16-24.)

At approximately 2:07 p.m., Prince glanced into the sobering cell to check on Gaunt and noticed she was not in her normal place in front of the privacy wall. Prince then saw Gaunt's foot from the ankle down protruding from the privacy wall and moving in a tapping motion. She appeared to have a blanket on part of her foot and at the end of the privacy wall, and no other part of her body extended past the

privacy wall.  (Prince Depo. 155:3-156:25, 158:17-24, 159:8-160:23.)  Prince watched her foot move for a couple seconds, then she asked Aleman to check the video monitor in the booking area.  Prince claims she asked Aleman to see what Gaunt was doing, and Aleman said Gaunt was sitting there and was fine.  (Prince Depo. 157:10-21, 160:24-161:25.)  Aleman testified that Prince asked *if he could see Gaunt*, not what she was doing, and he responded that yes, he could see her behind the wall.  (Aleman Depo. 53:20-55:18, 64:25-65:12.)  Prince did not state why she was asking, and Aleman believed that Prince was going to enter the cell to check on Gaunt as County policy required, and she wanted to know Gaunt's location before entering.  (Aleman Depo. 55:2-57:12, 57:23-60:1, 60:13-15; Leffler Depo. 92:3-93:4.)  Prince did not try to yell or call to Gaunt, and she did not try to enter the cell to see what Gaunt was doing behind the wall, and she did not determine whether Gaunt was experiencing stress.  The cell check took 30 seconds.  Prince did not speak to anyone about Gaunt, or look at the monitor herself to see what Gaunt was doing.  (Prince Depo. 162:23-163:19, 164:5-17, 165:1-166:14, 175:4-21, 180:23-181:10.)

Robbins eventually contacted Gaunt's ex-husband who advised that Gaunt was detained for 5150 in Santa Rosa three days earlier, had a cluster of mental health issues, had become delusional five years prior, and she had a history of drug and alcohol use her whole life.  (Robbins Depo, 144:19-145:15.)  Within approximately 5 minutes of Robbins' visit at 2:07 p.m., while she was on the telephone with Gaunt's ex-husband, Gaunt began to commit suicide.  (Robbins Depo, 140:13-141:12.)

At approximately 2:25 p.m., McCollough stood at the cell window and saw Gaunt's foot protruding from the privacy wall so he yelled to Gaunt, but got no response.  The County policy required officers to give a verbal command to inmates behind a privacy wall to come out so they could be seen, and to then enter to visually observe the individual and move them if necessary.  (McCollough Depo. 80:25-83:7, 88:16-19; 86:3-16.)  McCollough thus entered the cell, announced his presence, and halfway into the cell saw over the wall that Gaunt was on the other side between the wall and toilet.  McCollough continued around the privacy wall and saw Gaunt slumped on the ground with an inmate-made ligature around her neck that was looped over the sink faucet for leverage and held in her hand.  McCollough immediately removed the ligature and pulled her around in front of the wall.  (McCollough Depo. 83:8-85:17.)  McCollough called out to Prince and Aleman for assistance.  (Prince Depo. 177:4-9.)

Gaunt appeared to have fashioned the ligature from portions of the sobering cell blanket that was

1   given to her.  (McCollough Depo. 86:17-22; Prince Depo. 171:25-172:16.)  None of the officers had

2   observed torn pieces of blanket in her cell at any time before the incident, and the officers would have

3   taken the blanket away if they had seen it torn up.  (McCollough Depo. 86:23-87:11; Leffler Depo.

4   93:20-94:19, 107:24-108:2.)  Robbins was still on the phone with Gaunt's ex-husband when she got a

5   code 3 call alerting her that Gaunt had committed suicide.  (Robbins Depo, 146:3-9.)

## III.   LEGAL ARGUMENT

### A.   Summary Judgment is Proper in this Case

"The party moving for summary judgment bears the initial burden of demonstrating the absence
of a genuine issue of fact for trial. …When the nonmoving party has the burden of proof at trial, the
moving party need only point out "that there is an absence of evidence to support the nonmoving party's
case.'"  (*Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).)  "Once the moving party carries its
initial burden, the adverse party … must provide affidavits or other sources of evidence that 'set forth
specific facts showing that there is a genuine issue for trial."  (*Id.*, FRCP Rule 56(e) and *Celotex Corp. v.
Catrett*, 477 U.S. 317, 323-324 (1996).)  The undisputed evidence in this case establishes that plaintiff
has no evidence showing a genuine issue for trial, and summary judgment should be granted.

### B.   The Undisputed Evidence Establishes that Plaintiff's §1983 Claim for Deliberate Indifference to Serious Medical Needs Is Unsupportable

To state a §1983 claim, plaintiffs must show "(1) that a person acting under color of state law
committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or
immunity protected by the Constitution or laws of the United States."  (*Leer v. Murphy*, 844 F.2d 628,
632-633 (9th Cir. 1988), *citing Parratt v. Taylor,* 451 U.S. 527, 535 (1981), *overruled on other grounds,
Daniels v. Williams,* 474 U.S. 327, 328 (1986).)  Vicarious liability is inapplicable in §1983 actions, and
plaintiffs must show that each defendant, through their own individual actions, violated the constitution
as to each plaintiff claiming injury.  (*Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).)  Plaintiff must show
that the defendant's unconstitutional conduct was the actual and proximate cause of his injuries.  (*White
v. Roper*, 901 F.2d 1501, 1501-1506 (9th Cir. 1990); *Pearson v. Callahan*, 129 S.Ct. 808 (2009).)
"Officers are fundamentally involved in the alleged violation when they provide some affirmative
physical support at the scene of the alleged violation <u>and when they are aware of the plan to commit the</u>

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

1  alleged violation or have reason to know of such plan but do not object." [Emphasis added.] (*Monteilh*

2  *v. County of Los Angeles*, 820 F.Supp.2d 1081, 1089 (C.D. Cal. 2011), *citing Jones v. Williams,* 297 F.3d

3  930, 936 (9th Cir. 2002); *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 481, n. 12 (9th Cir.

4  2007).)

5      **1.**    **Plaintiff's 14th Amendment Claim Against the Deputies and Officers Is Unsupported**

6                   **by Evidence**

7          Under the due process clause, "persons in custody have the established right not to have officials

8  remain deliberately indifferent to their serious medical needs." (*Gibson v. Cty. Of Washoe,* 290 F.3d

9  1175, 1187 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty of Los Angeles*, 833 F.3d 1060

10  (9th Cir. 2016) (*en banc*).)  To prevail on a Fourteenth Amendment claim for inadequate medical care, a

11  detainee must show "deliberate indifference" to his or her "serious medical needs." (*Lolli v. Cnty. of*

12  *Orange,* 351 F.3d 410, 419 (9th Cir. 2003).)  The Courts "have long analyzed claims that correction

13  facility officials violated pretrial detainees' constitutional rights by failing to address their medical needs

14  (including suicide prevention) under a 'deliberate indifference' standard." (*Clouthier v. Cnty. of Contra*

15  *Costa,* 591 F.3d 1232, 1241 (9th Cir. 2010), (citations omitted), *overruled on other grounds by Castro*,

16  833 F.3d 1060.)  "First, the plaintiff must show a serious medical need by demonstrating that failure to

17  treat a prisoner's condition could result in further significant injury or the unnecessary and wanton

18  infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately

19  indifferent." (*Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006); *see also, Castro,* 833 F.3d at 1071,

20  plaintiff must prove he was "at a substantial risk of suffering serious harm.")  "[O]fficials are deliberately

21  indifferent to a prisoner's serious medical needs when they deny, delay or intentionally interfere with

22  medical treatment.'" (*Lolli,* 351 F.3d at 419.)  The indifference to a detainee's medical needs must be

23  substantial; "an inadvertent failure to provide adequate medical care does not, by itself, state a deliberate

24  indifference claim for §1983 purposes." (*Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012);

25  *Williams v. Ralston,* 2014 WL 3926990, at *5 (C.D. Cal. Aug. 12, 2014).)

26          The traditional analysis of a pretrial detainee's Fourteenth Amendment claim for inadequate

27  medical care has been determined under the Eighth Amendment's subjective deliberate indifference

28  standard.  (*See Simmons v. Navajo Cnty, Ariz.,* 609 F.3d 1011, 1017 (9th Cir. 2010); *Conn v. City of*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

*Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).)  Subjective "[d]eliberate indifference is a high legal standard."  (*Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).)  A person is liable for denying a detainee needed medical care "only if the person 'knows of and disregards an excessive risk to…health and safety.…In order to know of the excessive risk, it is not enough that the person merely 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, he must also draw that inference.'… If a person should have been aware of the risk, but was not, then the person has not violated the [deliberate indifference standard], no matter how severe the risk."  (*Gibson,* 290 F.3d at 1188, *citing Jeffers v. Gomez,* 267 F.3d 895 (9th Cir. 2001); *see also, Lolli,* 351 F.3d at 419, *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).)

Following the Supreme Court's decision in *Kingsley v. Hendrickson,* 135 S.Ct. 2466 (2015), involving claims of excessive force, and the Ninth Circuit's decision in *Castro v. Cnty. of Los Angeles*, regarding claims of failure to protect from harm by another inmate, plaintiffs have urged courts to apply an objective standard of deliberate indifference in medical needs cases that is easier to prove.  However, there is no Ninth Circuit or Supreme Court authority supporting the expansion of an objective standard to medical deliberate indifference cases and there is no legal basis to support this expansive reading. Indeed, recent district court cases have rejected this expansive reading and application of an objective standard as unsound.  In *Kingsley,* the Supreme Court held that a pretrial detainee claiming excessive force need only show objectively unreasonable force because a detainee has not yet been convicted of a crime, and the objective standard is more consistent with the *Graham* objective reasonableness standard applied to arrestees and accused persons not yet convicted of crimes.  (*Kingsley,* 135 S.Ct. at 2470, 2473-2475.)  In *Castro,* the Ninth Circuit expanded *Kingsley* to apply to claims that jail officials failed to protect pretrial detainee from harm by another inmate, finding that *Kingsley* rejected a single "deliberate indifference" standard applied to *all* §1983 claims regardless of whether plaintiffs were pretrial detainees or convicted prisoners.  (*Id.* at 1069-1070.)  The Court concluded that "a pretrial detainee who asserts a due process claim for failure to protect [must] prove more than negligence but less than subjective intent–something akin to reckless disregard."  (*Id.* at 1071.)  In *Guerra v. Sweeny,* 2016 WL 5404407 (E.D. Cal. 2016), the Eastern District noted that *Castro could* be further expanded to eliminate the subjective component of a pretrial detainee's denial of medical care claim, although it expressly

11

1   acknowledged that *Castro* did not address such claims and the standard by which a deliberate

2   indifference to serious medical needs claim is judged is subject to dispute.  (*Id.* at *3-*4.)  Other courts,

3   however, continued to apply the 8th Amendment subjective standard to pretrial detainees' claims of

4   injury resulting from untreated serious medical needs.  (*See Rickets v. Holland,* 2016 WL 6155926, *3

5   (C.D. Cal. 2016), *James v. Lee*, 2016 WL 5338074, *4 (E.D. Cal. 2016), *Estate of Sandra Vela v. Cnty.

6   of Monterey*, 2016 WL 4678300, *3 (N.D. Cal. 2016)*, Atayde v. Napa State Hosp.*, 2016 WL 4943959 *4

7   (E.D. Cal. 2016).)  Indeed, the weight of authority appears to reject an objective standard of deliberate

8   indifference for medical care claims and preserves the traditional subjective standard.

9        Very recently in *Sandoval v. Cnty. of San Diego,* 2018 WL 733775 (S.D. Cal. 2018), the court

10   issued a very thorough analysis of the objective and subjective standards in medical care cases and

11   rejected expansion of *Kingsley* or *Castro,* carefully explaining that the objective deliberate indifference

12   standard is improper and a traditional subjective standard applies.  In *Sandoval,* plaintiffs brought a

13   §1983 action following Sandoval's in-custody death from acute methamphetamine intoxication while a

14   pretrial detainee.  *Kingsley* was limited to an excessive force claim brought by a pretrial detainee, and an

15   objective standard in that situation was more akin to *Graham*'s Fourth Amendment excessive force

16   analysis that includes no state of mind requirement.  (*Sandoval*, 2018 WL 733775 at *6.)  The Ninth

17   Circuit in *Castro* found *Kingsley*'s reasoning required it to overrule the decision in *Clouthier, supra*, "to

18   the extent that it identified a single deliberate indifference standard for all §1983 claims and to the extent

19   that it required a plaintiff to prove an individual defendant's subjective intent to punish in the context of a

20   pretrial detainee's failure-to-protect claim."  (*Id.*, *citing Castro,* 833 F.3d at 1070.)  *Castro* noted that

21   *Kingsley* "did not squarely address whether the objective standard applies to all kinds of claims by

22   pretrial detainees, including both excessive force claims and failure-to-protect claims," but it found

23   enough similarities between the claims in *Kingsley* and *Castro* to extend *Kingsley*'s holding to failure-to-

24   protect claims.  (*Castro*, 833 F.3d at 1069-70.)  *Sandoval* rejected further expansion of *Kingsley* and

25   *Castro* to deliberate indifference medical care claims.  "First, neither *Kingsley* nor *Castro* overruled or

26   otherwise discussed application of an objective standard for determining a defendant's mental state in the

27   context of the claim at issue here, *i.e., an inadequate medical care claim* brought under the due process

28   clause of the Fourteenth Amendment.  Second, it appears the Ninth Circuit has declined to reach this

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

issue in at least three cases since *Castro* was decided."[1]  (*Sandoval*, 2018 WL 733775 at *6.)  *Sandoval* then analyzed and rejected district court cases expanding *Kingsley* and *Castro* to apply an objective deliberate indifference standard in medical care claims.  For example, *Guerra, supra*, did not conclude that *Castro*'s objective standard should be applied, but only discussed what that standard might look like under *Castro*'s reasoning; it acknowledged that the standard for deliberate indifference to serious medical needs is "subject to dispute," and *Guerra* recognized that even after *Castro* most district courts continued to apply the 8th Amendment subjective standard to pretrial detainees.  (*Sandoval*, 2018 WL 733775 at *7.)  In *Wishaar v. Cnty. of Napa*, 2016 WL 7242122 (N.D. Cal. 2016) the court assumed without discussion that *Castro* required courts to apply an objective standard to *all* claims alleging deliberate indifference under the Fourteenth Amendment, but this ignored that *Castro* expressly denounced a single standard for all §1983 claims.  (*Sandoval*, 2018 WL 733775 at *7.)  The *Sandoval* court concluded that "neither *Kingsley* nor *Castro* discussed application of an objective standard in the context of [an] inadequate medical care claim," and the subjective standard for deliberate indifference should apply.  (*Id.* at *8.)

In *Bremer v. Cnty. of Contra Costa*, 2016 WL. 6822011 (N.D. Cal. 2016), Judge Corley of this district likewise rejected the unfettered expansion of *Kingsley* and *Castro's* objective standard of deliberate indifference to medical care claims, acknowledging the Ninth Circuit had not yet addressed the issue and finding it unnecessary to decide whether the subjective or objective standard applied because plaintiff could not establish his denial of medical care claim under either standard.  (*Id.* at *6.)

Given that application of an objective standard of deliberate indifference is unsupported in authority, the traditional subjective standard of deliberate indifference should apply in this case.  The undisputed evidence establishes that plaintiff's deliberate indifference to medical care claim is unsupportable.  To be subjectively aware of a serious medical need, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw that inference."  (*Farmer*, 511 U.S. at 837, emphasis added.)  "In other words, a plaintiff must show that the official was '(a) subjectively aware of the serious medical need and (b) failed adequately to

---

[1] *See Edwards v. Mondora,* 700 F.App'x 661, 663 (9th Cir . 2017); *Darling v. Los Angeles Cnty. Sheriff's Dep't*, 695 F.App' 216, 217 (9th Cir. 2017); *Nyland v. Calaveras Cnty. Sheriff's Jail,* 688 F.app.x 483, 485 (9th Cir. 2017).

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

1   respond.'" (*Simmons*, 609 F.3d at 1018.)   Thus, plaintiff must produce evidence to show that the

2   defendant officers knew Gaunt "was 'in substantial danger' of killing [herself] yet deliberately ignored

3   such risk." (*Simmons*, 609 F.3d at 1018.)  Plaintiff has no evidence at all to meet this burden.

4        In *Simmons*, parents brought a §1983 claim for deliberate indifference to medical needs after

5   decedent committed suicide while a pretrial detainee.  Decedent had informed officers he tried to kill

6   himself, and he was placed on a suicide watch with constant observation for several weeks before being

7   downgraded to a lower suicide watch level with intermittent safety checks.  (*Simmons*, 609 F.3d at 1014-

8   1015.)  He repeatedly denied suicidal ideation and said he was doing better.  (*Id.*)  The Court found no

9   evidence that the nurse who downgraded his suicide watch level knew he "was at *acute* risk of harm" at

10  the time he killed himself.  (*Id.* at 1018, *citing Conn,* 591 F.3d at 1097.)  "Placing a pretrial detainee on

11  some level of suicide watch, even at the highest level, does not demonstrate a subjective awareness of a

12  substantial risk of *imminent* suicide." (*Simmons*, 609 F.3d at 1018.)  There was no evidence that in the

13  hours before the suicide the nurse observed suicidal actions, heard statements of a suicidal nature or

14  witnessed other evidence of his suicidal intent that would have alerted her to his impending suicidal

15  crisis.  (*Id.*, *citing Clouthier,* 591 F.3d at 1246, n.4.)  It was "not a case where a jail official knew a

16  pretrial detainee was actively suicidal but failed to ensure that precautionary measures were

17  undertaken,…or unilaterally halted such measures despite a belief that he was not yet 'out of the

18  woods.'" (*Simmons*, 609 F.3d at 1018-1019.)  Summary judgment thus was warranted.

19       The undisputed evidence in this case is even more inadequate.  None of the officers knew Gaunt

20  had a history of past suicide or suicidal ideation, she made no suicidal statements or gestures, she

21  expressly denied being suicidal or wanting to harm herself, she was in a sobering cell because she

22  appeared significantly intoxicated, she was not in a safety cell or on any level of suicide watch, and no

23  one observed her with her blanket torn into strips before her suicide.  Specifically, the undisputed

24  evidence establishes: 1) Brockwalder and Davis contacted Gaunt re reports of suspicious activity, she

25  displayed physical characteristics and objective signs of being under the influence of a substance, FSTs

26  showed objective signs of stimulant use, they saw no signs she was suicidal and she denied having

27  suicidal ideation or wanting to harm herself; 2) Rhine evaluated Gaunt at intake and observed signs of

28  intoxication and a history of drug use, but saw no signs of suicide attempts, she denied suicidal ideation

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

and made no statements indicating any threat of suicide, and Rhine saw no evidence of suicidal thoughts at any of the periodic checks over the next several hours until his shift ended at 6:00 p.m., and he had no involvement with Gaunt after that time; 3) Philippi observed Gaunt in the sobering cell between 6:00 p.m. August 1 and 6:00 a.m. August 2, 2015, observed her engaged in various mundane activities like sitting, standing, laying down, eating, and displaying signs of being under the influence; he conducted a FST, interacted with her and found her in good spirits, pleasant and cooperative but still appearing intoxicated, he saw no actions or signs indicating suicidal thoughts, and he had no involvement with her after his shift ended at 6:00 a.m., nearly 8 hours before her suicide; 4) McCollough checked Gaunt at regular frequent intervals and observed signs of her being under the influence, but she was responsive and exhibited no signs of suicidal thoughts and made no statements about suicide; 5) Leffler observed Gaunt and various times over the course of her time in jail, she observed that Gaunt appeared under the influence and at some times agitated, but she saw no signs of suicidal intent; 6) Aleman observed Gaunt once at 8:29 a.m. on August 2 and saw she was breathing, and had no information she had any suicidal ideation.  (Aleman Depo. 31:2-32:10.)  The evidence is undisputed that Nurse Robbins did not obtain information about Gaunt's history or past suicide attempts until Gaunt was in the process of or had committed suicide, and the defendant officers were not aware Gaunt had torn her blanket into strips before she committed suicide.  The undisputed evidence establishes that none of the defendants had any knowledge Gaunt was suicidal or that she had any suicidal ideation, and the evidence plainly fails to show they had knowledge that suicide was *imminent* yet ignored an acute risk of suicide in the face of clear warning signs.  Plaintiff cannot establish that defendants knew Gaunt was "in substantial danger" of killing herself and their deliberate indifference to medical needs claim is unsupportable.  (*Simmons*, 609 F.3d at 1018-1019, *Bremer*, 2016 WL. 6822011 at *7-*8; *Clouthier,* 591 F.3d at 1246, n.4.)

Further, Plaintiff has no evidence to establish that the officers' response to Gaunt was constitutionally inadequate.  Gaunt displayed objective signs of being significantly intoxicated, she was placed in a sobering cell to allow her to sober up before she could be released back into the public, and she was in a controlled environment where she could monitored and periodically checked.  Arguments that some period checks may not have comported with the policy for checks at 15 minute intervals, or that FSTs were not administered in a timely manner are insufficient to show the response provided was

inadequate.   The court in *Bremer* rejected these same arguments that the deputies' actions were insufficient because they failed to comply with the County's suicide prevention policy, explaining that "Conduct may violate a written policy without violating the Constitution.  *See Walker v. Sumner,* 14 F.3d 1415, 1419-1420 (9th Cir. 1994)…*overruled on other grounds by Sandin v. Conner,* 515 U.S. 472, 482-84 (1995)."  (*Bremer*, 2016 WL. 6822011 at *8.)  "[L]ike *Simmons,* this is 'not a case where a jail official knew a pretrial detainee was *actively* suicidal but failed to ensure that precautionary measures were undertaken, or unilaterally halted such measures despite a belief that he was not yet out of the woods." (*Id.*)  The undisputed evidence fails to show the officers' response was constitutionally inadequate.

Moreover, even if the court somehow expanded *Kingsley* and *Castro* to apply an objective standard of deliberate indifference in this case, the undisputed evidence still fails to support Plaintiff's claim.  The objective standard of deliberate indifference under *Kingsley* requires Plaintiff "to prove more than negligence but less than subjective intent–something akin to reckless disregard."  (*Castro,* 833 F.3d at 1071.)  There is no evidence the defendant officers even knew Gaunt was suicidal or had suicidal tendencies; Gaunt had not expressed any suicidal thoughts or ideation, made no threats of suicide, she was not on a suicide watch, defendants had no information about her history or past suicide attempts, and she made no suicidal gestures or gave any indication she was contemplating suicide during her contacts with the arresting officers, or during the 25 hours she was at the jail before her suicide.  None of the specific acts attributable to the individual defendants (outlined above) were "akin to reckless disregard" or even objectively unreasonable.  Like the court found in *Bremer,* "To the contrary, every reasonable trier of fact would have to find the deputies took reasonably available measures to abate Plaintiff's risk of suicide and there is no record evidence that would have alerted a reasonable officer that Plaintiff's suicide risk was so high that they needed to take immediate action to prevent it."  (*Bremer*, 2016 WL. 6822011 at *9.)  Further, "*Castro* did not overrule the *Simmons* court's holding that merely knowing that someone had been placed on suicide watch–even the highest level--is insufficient to put an officer on notice that the person is in imminent danger of harming themselves.…Ultimately, the objective standard does not require a defendant to take *all* available measures to abate a plaintiff's risk of suffering serious harm."  (*Id.* original italics.)  The measures taken to put Gaunt in a sobering cell and periodically evaluate and check on her was objectively reasonable in response to her intoxicated condition,

16

particularly given that there is no evidence at all of any suicidal threat, and fails to show reckless disregard.

Plaintiff's deliberate indifference to medical needs claim is unsupportable under any standard.

**2.      The Undisputed Evidence Fails to Support a Supervisory Liability Claim**

A supervisor "can be found liable in his individual capacity if there is a sufficient nexus between his own conduct and the constitutional violations committed by subordinates." (*Johnson v. City of Vallejo*, 99 F.Supp.3d 1212, 1219 (E.D. Cal. 2015); *Preschooler II v. Clark County Sch. Bd. Of Trs.,* 479 F.3d 1175, 1183 (9th Cir. 2007).)  Supervisors may be liable "under §1983 only if there exists either '(1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" (*Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)*; Jeffers,* 267 F.3d at 915.)  "A supervisor is liable for the constitutional violations of his subordinates only if [he] participated in or directed the violations, or knew of the violations and failed to act to prevent them." (*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Johnson*, 99 F.Supp.3d at 1219.) "A supervisor can be liable… for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." (*Starr,* 652 F.3d at 1208, *quoting Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998).)  Plaintiff has no evidence that Martin or Housman had any personal involvement with Gaunt or participation in the officers' contacts with her.  There is no evidence Martin or Housman inadequately trained, supervised or controlled the officers, or that any training, supervision or control of the officers caused a violation of Gaunt's constitutional rights, particularly given that the officers' conduct did not cause any constitutional violation.  Jail correctional staff receive regular training in compliance with the Board of State and Community Corrections' ("STC") standards and training, and Housman monitors, keeps track of and ensures jail personnel complete the required STC training.  They also receive medical issues and suicide prevention training pursuant to County jail policies that are in full compliance with the state's Title 15 standards.  Plaintiff's supervisory liability claims against Martin and Hosman are baseless.

**3.      Plaintiff's §1983 Claim Against the County, Martin and Hosman Is Unnecessarily Duplicative and Meritless**

17

1    The first cause of action against the County, Martin and Hosman is unnecessarily duplicative of

2    the second and third causes of action specifically asserting §1983 14th Amendment claims regarding

3    medical/mental health, and fail for the reasons discussed below.  Plaintiff also asserts his §1983 claim

4    against Martin and Housman in their official capacities.  (Compl. ¶8.)  Official-capacity suits "generally

5    represent only another way of pleading an action against an entity of which an officer is an agent."

6    (*Monell v. New York Dept. of Social Servs.*, 436 U.S. 658, 690, n.55 (1978); *Kentucky v. Graham*, 473

7    U.S. 159, 165-166 (1985) "the real party in interest is the entity"; *Center for Bio-Ethical Reform, Inc. v.*

8    *Los Angeles Cnty. Sheriff*, 533 F.3d 780, 799 (9th Cir. 2008).)  "If both are named, it is proper upon

9    request for the Court to dismiss the official-capacity officer, leaving the local government entity as the

10   correct defendant."  (*Arres v. City of Fresno*, 2011 WL 284971 at *6 (ED Cal. 2011) *citing Luke v.*

11   *Abbot*, 954 F.Supp. 202, 204 (C.D. Cal. 1997); *Butler v. Elle*, 281 F.3d 1014, 1023 fn. 8 (9th Cir. 2002).)

12   The official capacity claims are meritless.

13   **C.    The Officers are Entitled to Qualified Immunity from Plaintiff's §1983 Claims**

14       Even if the defendants' conduct somehow constituted a violation of Gaunt's constitutional rights,

15   qualified immunity shields them from liability for such claims.  Qualified immunity protects officers

16   from liability where their conduct does not violate clearly established law, regardless of whether the error

17   is a mistake of law, fact or a combination of the two, and applies where a reasonable officer could have

18   believed the conduct was justified, **notwithstanding that reasonable officers could disagree.**

19   (*Pearson,* 129 S.Ct. at 815; *Hunter v. Bryant,* 502 U.S. 224, 228 (1991).) **A court discerns whether "the**

20   **[officer] acted reasonably under settled law in the circumstances, not whether another reasonable,**

21   **or more reasonable interpretation of the events can be constructed…after the fact.**"  [Emphasis

22   added.]  (*Hunter,* 502 U.S. at 228.)  Qualified immunity "gives ample room for mistaken judgments by

23   protecting all but the plainly incompetent or those who knowingly violate the law."  (*Id.* at 227.)

24       Qualified immunity recognizes "that reasonable mistakes can be made as to the legal constraints

25   on particular police conduct.… If the officer's mistake as to what the law requires is reasonable,… the

26   officer is entitled to the immunity defense."  (*Brosseau v. Haugen,* 543 U.S. 194, 205 (2004).)  "[T]he

27   Court considers only the facts that were knowable to the defendant officers."  (*White v. Pauly,* 137 S.Ct.

28   548, 550 (2017), *Kingsley*, 135 S.Ct. at 2474.)  "In determining whether an officer is entitled to qualified

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

immunity, we employ a two-step test:  first, we decide whether the officer violated a plaintiff's constitutional right; if the answer to that inquiry is 'yes,' we proceed to determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the events in question." (*Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011).)  It is Plaintiff's burden to show the law was clearly established so "**every reasonable official would [have understood] that what he is doing violates that right**." [Emphasis added.]  (*Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012).) "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." (*Reichle*, 132 S.Ct. at 2093; *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), *Mattos*, 661 F.3d at 442.)  Whether the law was clearly established "must be [determined] in light of the specific context of the case, not as a broad general proposition." (*Saucier v. Katz,* 533 U.S. 194, 205 (2001), overruled in part re mandatory analysis procedure, *Pearson,* 129 S.Ct. at 813, 818).)   "[It must] be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." [Emphasis added.] (*Katz,* 533 U.S. at 202; *Brosseau,* 543 U.S. at 205; *Mattos*, 661 F.3d at 442, *al-Kidd*, 563 U.S. at 742.)  It is not enough to "determine the broad question of whether the seizure…violated the fourth amendment's proscription against unreasonable seizures." (*Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991).)  The Ninth Circuit, en banc, reiterated that general Fourth Amendment principles may only provide clearly established law in *obvious cases* and the Supreme Court "clarified that the bar for finding such obviousness is quite high.…[T]he Court emphasized that it has 'repeatedly told courts not to define clearly established law at a high level of generality.'" (*Mattos*, 661 F.3d at 442*, citing al-Kidd*, 563 U.S. at 742.)  The question is whether it is "'sufficiently clear' that every reasonable official would have understood that what he is doing violates that right.'" (*Id., citing al-Kidd*, 563 U.S. at 741.)

As the Supreme Court very recently explained, "In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. … The Court has found this necessary both because qualified immunity is important to 'society as a whole,' and because as 'an immunity from suit' qualified immunity 'is effectively lost if a case is erroneously permitted to go to trial." (*White*, 137 S.Ct. at 551.)  The Court thus explained:

> [I]t is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality."  … As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. … Otherwise "[p]laintiffs would be able to convert the rule of qualified immunity … into a rule of virtually unqualified liability

19

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

1

simply by alleging violation of extremely abstract rights." …

2

The panel majority misunderstood the "clearly established" analysis:  It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated

3

the Fourth Amendment.  Instead, the majority relied on *Graham, Garner,* and their Court of Appeals progeny, which – as noted above—lay out excessive-force principles at only a general

4

level.  Of course, "general statements of the law are not inherently incapable of giving fair and clear warning" to officers, … **but "in the light of pre-existing law the unlawfulness must be**

5

**apparent."** … For that reason, we have held that *Garner* and *Graham* do not by themselves create clearly established law outside "an obvious case." [Emphasis added.]

6

(*White,* 137 S.Ct. at 552; *Brosseau,* 543 U.S. at 199; *Plumhoff v. Rickard,* 134 S.Ct. 2012, 2023 (2014).)

7

Where a case presents a "unique set of facts and circumstances," this alone should be an indication that

8

an officer's conduct did not violate a "clearly established" right.  (*White,* 137 S.Ct. at 552.)

9

Plaintiff cannot establish that the law was clearly established prohibiting any of the officers

10

'conduct under the "set of facts and circumstances" in this case.  There is no authority requiring the

11

arresting deputies or the jail officers to have determined Gaunt was suicidal despite the objective signs

12

that she was under the influence of some substance, and the <u>complete lack</u> of any indication she was

13

suicidal or had a history of mental illness or suicidal ideation.  There is no authority requiring officers to

14

provide treatment for or to protect against conditions that are unknown to them.  Plaintiff cannot show

15

that it was clearly established such that every reasonable officer would know, beyond debate, that it was

16

unlawful to arrest Gaunt for public intoxication when she exhibited objective signs of intoxication and

17

never disclosed hidden suicidal thought, or to place such persons in a jail sobering cell and monitor their

18

condition for signs of intoxication.  Plaintiff cannot meet his burden to show that "every reasonable

19

officer" would know "beyond debate" that they were required to obtain medical treatment for and

20

prevent secret suicidal thoughts and acts.  Moreover, Plaintiff's claim that officers are liable for failing to

21

discover, treat or protect against unknown conditions is not so obvious that the Court could define clearly

22

established law at a high level of generality.  (*Mattos,* 661 F.3d at 448, 452.)  The law on Plaintiff's 14th

23

Amendment deliberate indifference to medical care claims based on the unique set of facts in this case,

24

where officers have no information at all that a subject is suicidal, is not clearly established. Qualified

25

immunity thus shields the individual defendants from Plaintiff's §1983 claim.

26

**D.**   **The *Monell* Claim for Inadequate Policies, Customs or Practices Is Meritless**

27

"A municipality cannot be held liable … under § 1983 on a respondeat superior theory."  (*Monell,*

28

436 U.S. 658, 691 (1978).)  Local governing bodies can be sued directly under §1983 only where the

alleged unconstitutional conduct is the result of an official policy, pattern or practice.  (*Id.* at 690.)  A municipality is subject to liability under §1983 only when a violation of a federally protected right can be attributed to (1) an express municipal policy, such as an ordinance, regulation or policy statement (*Monell,* 436 U.S. at 658); (2) a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law" (*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); (3) the decision of a person with "final policymaking authority" (*Id.* at 123); or (4) inadequate training that is deliberately indifferent to an individual's constitutional rights (*City of Canton v. Harris,* 489 U.S. 378 (1989)).  Plaintiffs must show a sufficient causal connection between the enforcement of the municipal policy or practice and the violation of their federally protected right.  (*Harris,* 489 U.S. at 389; *Connick v. Thompson,* 563 U.S. 51, 60 (2011).)  "[A] municipality can be liable under § 1983 <u>only where its policies are the moving force behind the constitutional violation</u>."  [Emphasis added.]  (*Harris*, 489 U.S. at 389; *Bd. of the Cnty. Comm'rs. of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1996).)  "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." (*Brown,* 520 U.S. at 405; *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill,* 130 F.3d 432, 438 (9th Cir. 1997); *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012).)  Further, municipal liability is contingent on an underlying violation of constitutional rights.  (*City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Aguilera v. Baca*, 510 F.3d 1161, 1174 (9th Cir. 2007).)

To show municipal liability based on a custom or practice, the critical issue is whether there was a particular custom or practice that was so widespread as to have the force of law.  (*Brown,* 520 U.S. at 404.)  "The custom or policy must be a 'deliberate choice to follow a course of action…made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'"  (*Castro,* 833 F.3d at 1060, *citing Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986) (plurality opinion).)  "It is not sufficient for a plaintiff to identify a custom or policy, attributable to the municipality, that caused his injury.  A plaintiff must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [parties]."  (*Castro,* 833 F.3d at 1076; *Harris,* 489 U.S at 392.)

Plaintiff asserts that the County's policies, customs or practices for providing medical and mental

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

health care to detainees at the jail and to protect detainees from unnecessary harm, pain or suffering at the jail was inadequate, and that Martin and Hosman were aware of the inadequate policies and deliberately indifferent to Gaunt's medical and mental health needs.  (Complaint ¶¶61-62, 66.)  The County's policies 508 and 538 set forth the requirements and guidelines for "inmate safety checks" and field sobriety tests; both of which are in full compliance with the state's Title 15 standards.  (Prince Depo. 94:19-25, Exh. E, 99:23-100:7, 106:3-107:7, Exh. F; Hosman Depo. 22:25-23:21, 24:10-20, Exhs. A-D, 27:15-18, 34:6-22, 36:11-16.)  Plaintiff has no evidence to establish that the County's policies were inadequate, or that Martin or Hosman were deliberately indifferent to Gaunt's medical or mental health needs.  Moreover, Plaintiff has no evidence to show a causal connection between a County custom or policy and the alleged violation of Gaunt's right to protection against deliberate indifference to her medical or mental health needs.  (*Harris,* 489 U.S at 392.)  Policies 508 and 538 in fact show that the County had adequate policies in compliance with state standards to ensure safety in the sobering cells, and there is no evidence that these policies were the moving force behind Gaunt's suicide.  Plaintiff has no evidence to meet the "rigorous standard" of culpability and causation and his *Monell* inadequate policies claim is unsupportable.  (*Brown,* 520 U.S. at 405; *AE ex rel. Hernandez,* 666 F.3d at 636.)[2]

### E.    The *Monell* Claim for Inadequate Training Is Unsupported by Evidence

The Supreme Court carefully explained the parameters of an inadequate training claim in *City of Canton v. Harris*.  In *City of Canton,* a detainee suffering from emotional ailments claimed the jail staff's failure to summon medical attention for her after she slumped to the floor on two occasions was the result of the City's failure to train.  The Supreme Court held municipal liability on a failure to train theory could attach "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  (*Id*. at 388.)  The Court explained that: "Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under §1983….Municipal liability under §1983 attaches where – and only where–a deliberate choice to follow a course of action is made from among various alternatives by city

---

[2] The claims against Martin and Hosman in their official capacities are unnecessarily redundant of the claims against the County and fail for the same reasons.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

policymakers." (*Id.* at 389.)  Notably:

> [T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program…It may be…that an otherwise sound program has occasionally been negligently administered.…Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program…And plainly, adequately trained officers occasionally make mistakes: the fact that they do says little about the training program or the legal basis for holding the city liable.… Moreover, … [plaintiff] must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs. [¶] To adopt lesser standards…would result in *de facto respondeat superior* liability on municipalities – a result we rejected in *Monell.*  (*Id.* at 389-392.)

The Supreme Court has made clear that "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." (*Connick,* 563 U.S. at 61.)  Inadequate training claims require facts showing deliberate indifference to a constitutional right.  This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymaker of the city can reasonably be said to have been deliberately indifferent to the need." (*Harris*, 489 U.S. at 390; *Connick,* 563 U.S. at 62.)  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.' [¶] A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train.  (*Connick*, 563 U.S. at 61-62; *see also Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).)  Although this is a high standard, the Supreme Court warned that "permitting cases against cities for their 'failure to train' employees to go forward under §1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities – a result [the Supreme Court] rejected in *Monell*." (*Harris,* 489 U.S. at 391-392; *see also, Monell.*)

County officers receive proper and sufficient training every year that meets STC standards. (Hosman Depo. 17:21-18:19, 18:20-19:21, 20:19-21:15, 46:1-17, Exh. G.)  Plaintiff has no evidence to show that the County's training regarding caring for persons held in sobering cells to discover undisclosed and hidden conditions was inadequate, or that the need for more or different training was so obvious.  Gaunt denied she was suicidal or had thoughts of suicide, and she did not exhibit physical signs of suicide or behavior showing an imminent attempt to commit suicide.  Plaintiff has no evidence of

1 similar incidents, or that a constitutional violation has been found under similar circumstances, and

2 plaintiff cannot show that the need for training to discover completely hidden medical or mental health

3 conditions was so obvious and so likely to result in constitutional violations that the County, Martin or

4 Housman could be liable for failing to provide such training.

5 **F.    The Undisputed Evidence Fails to Support a Negligence Claim**

6          "The elements of a negligence cause of action are duty to use due care and breach of duty, which

7 proximately causes injury."  (*Lopez v. City of Los Angeles*, 196 Cal.App.4th 675, 685 (2011), *Homes v.*

8 *Summer*, 188 Cal.App.4th 1510, 1528 (2010).)  "'Absent a legal duty, any injury is an injury without

9 actionable wrong.'"  (*J.L. v. Children's Institute, Inc.*, 177 Cal.App.4th 388, 396 (2009).)  "The existence

10 of a duty of care is a question of law to be determined by the court alone."  (*Parsons v. Crown Disposal*

11 *Co.,* 15 Cal.4th 456, 472-473 (1997).)   The undisputed evidence fails to establish negligence claims

12 against each of the individual officers; Brockwalder and Davis had no duty to refrain from arresting

13 Gaunt under the circumstances, and Rhine, Philippi, McCollough, and Leffler had no duty to discover

14 suicidal ideation notwithstanding Gaunt's denials and the lack of objective signs of suicidal intent.  There

15 is no evidence that the officers or Martin or Hosman owed any duty to act otherwise in this case, or

16 breach of any duty.  The individual defendants are not liable for the acts of others as a matter of law.

17 (Gov. Code §820.8.)  Negligence claims against the County directly are untenable because the County's

18 liability is statutory only and no statute imposes negligence liability directly against a public entity

19 defendant.  (Gov. Code §815(a); *Guzman v. Cnty. of Monterey*, 46 Cal.4th 887, 897 (2009).)

20 **G.    Plaintiff Lacks Evidence to Show a Violation of Gov. Code §845.6**

21          Government Code §845.6 imposes liability for failing to obtain medical care for a prisoner in his

22 custody "if the employee knows or has reason to know that the prisoner is in need of immediate medical

23 care and he fails to take reasonable action to summon such medical care."  Section 845.6 claims require

24 evidence that "(1) the public employee knew or had reason to know of the need (2) for immediate

25 medical care, and (3) failed to reasonably summon such care."  (*Jett, supra,* 439 F.3d at 1099.)  "Liability

26 under section 845.6 is limited to serious and obvious medical conditions requiring immediate care.

27 (*Kinney v. Contra Costa Cnty.* (1970) 8 Cal.App3d 761, 770.)"  (*Watson v. State,* 21 Cal.App.4th 836,

28 841 (1993); *Jett*, 439 F.3d at 1099.)  In *Lucas v. City of Long Beach,* 60 Cal.App.3d 341 (1978), the City

1    was not liable when decedent committed suicide in police custody because the evidence failed to show he

2    was in obvious need of medical care at the time of his arrest and booking, and his suicide was not a

3    reasonably foreseeable result of police officer's failure to comply with regulations requiring hourly cell

4    inspections.   Although he exhibited emotional upset about his arrest, "there [was] not a scintilla of

5    evidence…that his conduct was any different than one might expect of a person intoxicated on either

6    drugs or alcohol.…Since [he] manifested only the symptoms of intoxication, Govt. Code section 855.6

7    bars any claim based on the failure to have him examined medically."   (*Id.* at 350.)   *Lucas* is directly on

8    point here.   The undisputed evidence shows "not a scintilla of evidence" that Gaunt's conduct was any

9    different than someone under the influence of drugs, and there is no evidence at all that she presented any

10   indication of suicidal intent.   The §845.6 claim is meritless and barred by §855.6.

**H.     Plaintiff Has No Evidence to Establish a Claim for Violation of the ADA**

12          To state a claim under Title II of the ADA, a plaintiff must allege: "(1) he 'is an individual with a

13   disability;' (2) he 'is otherwise qualified to participate in or receive the benefit of some public entity's

14   services, programs, or activities;' (3) he 'was either excluded from participation in or denied the benefits

15   of the public entity's services, programs, or activities, or was otherwise discriminated against by the

16   public entity;' and (4) 'such exclusion, denial of benefits or discrimination was by reason of [his]

17   disability.'"   (*O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007).)   The undisputed

18   evidence fails to show Gaunt suffered from any disability, or that she was denied services or

19   discriminated against because of a disability.   The ADA claim is meritless.

**I.     Plaintiff Has No Evidence to Establish a Claim for Violation of Civil Code §51 for Discrimination and Failure to Accommodate Gaunt's Alleged Mental Disability**

22          Civil Code §51 prohibits discrimination based on a mental or physical disability.   There is no

23   evidence that Gaunt had a disability within the meaning of the section, and the undisputed evidence fails

24   to show any disparate treatment or discrimination against Gaunt as a result of any disability.

### IV.     CONCLUSION

26          For the reasons set forth above and in defendants' supporting papers filed concurrently herewith,

27   the Lake County Defendants respectfully submit that the instant motion for summary judgment, or in the

28   alternative, partial summary judgment, should be granted in their favor and against Plaintiff.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI

Dated:  February 28, 2018                    BERTRAND, FOX, ELLIOT, OSMAN & WENZEL


By: _____*/s/ Gregory Fox*_____
       Gregory M. Fox
       Joanne Tran
       Attorneys for Defendants
       County of Lake, Sheriff Brian Martin, Captain
       Greg Hosman, Sergeant Renee Leffler, Officer
       James Rhine, Officer Douglas Aleman, Officer
       Jared McColough, Officer Joshua Phillipi, Deputy
       Kalen Brockwalder, Deputy Michael Davis

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
*Shikman v. County of Lake, et. al.*, USDC Northern Dist. Case No. 1:16-cv-05121-RMI